Scott
v.
Eagle Fire Co.

---

### Scott *vs.* The Eagle Fire Company and others.

Where an incorporated company becomes insolvent before its surplus funds have been apportioned, as dividends, among its stockholders, such surplus funds, as well as the capital stock of the company, must if necessary be applied to satisfy its debts ; to the exclusion of any prior claim of the stockholders on such surplus.

The unearned premiums, received by an insurance company in advance upon policies of insurance, are not surplus profits which the directors are authorized to distribute as dividends among the stockholders of the company, but are the ordinary means, or primary fund, out of which the losses upon such policies should be paid.

It is the duty of the directors of an insurance company, instead of dividing the unearned premiums among the stockholders, to reserve at all times a sufficient fund, in addition to the capital stock, to meet the probable losses on risks assumed by the company and which have not expired.

The directors of a joint stock corporation may be compelled to divide the actual surplus profits of the company, among its stockholders, from time to time, if they neglect or refuse to do so without any reasonable cause. But if they abuse their power to make dividends of surplus profits, by dividing the unearned premiums received by them, without leaving a sufficient

fund, exclusive of the capital stock, to satisfy the probable losses upon risks assumed by the company, it seems they will be personally liable to such creditors of the company, if in consequence of extraordinary losses the company should become insolvent so as to be unable to pay its debts.

1838.

Scott
v.
Eagle Fire Co.

THE Eagle Fire Insurance Company was one of the corporations rendered insolvent by the great fire in New-York, in December, 1835; and this bill was filed by some of the stockholders, in behalf of themselves and others, claiming all the surplus funds of the company in the hands of the receivers, beyond the capital stock of the company at the time of the fire which produced the insolvency. It appeared by the bill and answer, that at the time of making the last dividend, a little short of six months previous to the great fire, the surplus fund, beyond the capital stock and the dividend then made, was about $73,000, if all the debts due to the company were good and collectable; at which time the amount of property remaining insured by the company was about ten millions of dollars. At the time of the fire this surplus fund had increased, by the receipt of new premiums, &c. to about $97,000; but the total amount of property at risk at that time was not stated in the pleadings. The cause was heard on bill and answer, before the vice chancellor of the first circuit. He decided that the complainants were not entitled to the funds of the company beyond the amount of the capital stock; but that the creditors of the corporation were entitled to have the surplus fund, as well as the capital stock, applied in payment of their debts. The bill was therefore dismissed with costs. From this decision and decree the complainants appealed to the chancellor.

May 28.

*J. Anthon*, for the appellants. The capital of a corporation being entire, the adventurers have no other fund but this to look to for the reimbursement of their losses. The stockholders are entitled from year to year to all the surplus funds remaining, over and above the capital, after the payment of all the losses arising out of the business of the year. No adventurer has a right to claim the application of the surplus profits, earned on the closed business of former years, to the payment of his loss on a contract of a sub-

sequent year. If the risks of a current year, by an extraordinary casualty, terminate in losses exceeding the capital, the adventurers of that year (the capital being entire) must claim pro rata on that capital. A surplus on closing the operations of any given year being ascertained and declared, an omission to divide it does not make it part of the capital, so as to subject it to the demands of future adventurers; but it remains a fund held in trust by the company for future distribution among the stockholders. A contrary rule would enable a corporation to increase its capital ad libitum, without the assent of the legislature. This conclusion is confirmed by the charter of the Eagle Fire Company, which points out a precise and specific mode of increasing the amount of the capital; and this can be done in no other way. The stockholders, therefore, who have either actually purchased this surplus or earned it by the risk of their funds, are the only persons entitled to it; and upon the account prayed for in the bill, the adventurers of the past year can only insist that the earnings of that year shall be retained to keep the capital pro rata entire. (4 *Laws of New-York*, p. 564, 29*th sess.*, ch. 152. *Wood* v. *Dummer*, 3 *Mason*, 311.) The company—quasi company—cannot make a contract pledging the surplus funds as well as the capital for the payment of the debts of the company. Its powers are limited by the charter to the legal capital, which it can alone bind by contract. The consent of the stockholders would not give such powers for the same reason. The directors are the mere agents of the stockholders, limited in their powers by the charter, and cannot bind them beyond the legal capital. If the stockholders are competent, by acquiescence or otherwise, to put their earned profits or any other portion of their profits at risk, it cannot be in the character of stockholders; the charter forbidding it. It can be done only in the character of underwriters, and then as they would be personally responsible, they would in their personal character receive the profits and be subject to the loss.

1838.

Scott
v.
Eagle Fire Co.

*G. Griffin,* for the respondents. It is a universal principle of law that all the property of a debtor is liable to the payment of his debts. The universality of this principle applies as well to corporate as to individual debtors. At the time of the fire, the accumulated profits in question were the property of the company. The act incorporating the Eagle Fir: Ins. Co., authorizes (*sect.* 4) the increase of the stock of the company to one million of dollars. The directors had the power to let all the profits accumulate with the view of adding them to the capital, provided it was done with the acquiescence of the stockholders themselves; and provided also that the addition of the accumulated profits did not swell the effects of the company to an amount exceeding one million of dollars. At any rate, the illegality, if any, would be a matter to be moved by the attorney general; and it would not be competent for the acquiescing stockholders to complain. (*Trustees of Vernon* v. *Hill,* 6 *Cowen,* 23.) The accumulated profits would, in such case, amalgamate with the capital stock, and help to form a general fund for the payment of the creditors of the company. The directors had an unlimited discretion as to the "portions" of the profits that were from time to time to be divided. If they had grossly abused their discretion, either as to the times or the amounts of the dividends, the court of chancery might perhaps have interfered on the complaint of the stockholders, had such complaint been seasonably interposed. The notion is unfounded that the claims of the creditors of the company are confined to the numerical sum of five hundred thousand dollars which composed the original capital of the company. Even if the distribution of the surplus profits might originally have been exacted by the stockholders, they afterwards, by permitting such surplus profits notoriously to remain in the hands of the corporation, and to form an integral part of its effects, on the credit of which it received premiums and underwrote policies of insurance, virtually pledged such profits to the payment of any losses which might accrue under such policies. The directors were in truth the agents of the stockholders; and if the directors were allowed by the stockholders, even

incorrectly, to amalgamate the surplus with the original capital, and thus gain a spurious credit for the company, the principals must suffer, and not innocent creditors. The surplus ceased to exist the moment that debts accrued sufficient to absorb it. The same fire which brought into existence our claims against the company, reduced to annihilation the surplus for which our opponents contend. If the doctrine advocated by my learned opponent is correct, it follows as a necessary inference that the moment a dollar of profits is earned, it vests in the stockholders at once, whether a dividend of it has been declared or not ; that the creditors have nothing to do, in any case with the profits ; and that the company holds such profits only as the trustee of its stockholders.

THE CHANCELLOR. The claim made by the appellants in this case is founded upon the erroneous supposition that it is the duty of the directors of an insurance company to divide all its surplus funds beyond its capital stock, periodically, among its stockholders ; leaving such capital stock alone as the fund to which the creditors of the company, who become such by the loss of property insured, are to look for remuneration. But as I had occasion to say in another case, (*De Peyster* v. *The American Ins. Co. and others, In Chan.* 25th *May*, 1837,) the capital stock of an incorporated insurance company is not the primary or natural fund for the payment of losses which may happen by the destruction of the property insured. The charter of the company contemplates the interest upon the capital stock, and the premiums received for insurance, as the ordinary fund out of which losses are to be paid. And the surplus of that fund, after paying such losses, is surplus profits within the meaning of the charter ; which surplus profits alone are to be divided, from time to time, among the stockholders. The unearned premiums received by the company upon which the risks are still running, and which may therefore all be wanted to pay losses which may happen upon those risks, are not surplus profits which the directors are authorized by the charter to distribute among the stockholders.

1838.

Scott
v.
Eagle Fire Co.

The capital stock of the company is a special fund, provided by the charter, to secure the assured against great and extraordinary losses which the primary fund may be found insufficient to meet. And if it becomes necessary at any time to break in upon this special fund, to pay such extraordinary losses, it must be made good from the future profits of the company before any further dividends of those profits can be made. (1 *R. S.* 590, § 4.) The directors of an insurance company have therefore no right to divide all the interest or premiums on hand at the time a dividend is declared; but they should always leave a surplus fund, in addition to the capital stock, sufficient to meet the probable losses on the risks then assumed by the company and which have not then expired. And if any losses accrue upon such risks, whether more or less than the whole capital of the company, that surplus or contingent fund must be applied to satisfy such losses. The fact therefore that the amount of the losses in this case was more than all the funds of the company, including its capital, furnishes no reason whatever for taking the natural and primary fund for the payment of losses, and giving it to the stockholders, to the injury of the creditors of the company.

As the directors are bound to exercise a proper discretion in making dividends of surplus profits, if they abuse that power by dividing the unearned premiums without leaving sufficient to satisfy the probable losses, they may, in case of any extraordinary loss which is sufficient to exhaust the whole capital and more, make themselves personally liable to the creditors of the company. On the other hand, should they without reasonable cause refuse to divide what is actually surplus profits, the stockholders are not without remedy, if they apply to the proper tribunal, before the corporation has become insolvent. But after such insolvency it would not only be improper but it would be highly inequitable to take such surplus fund and divide it among the stockholders; leaving the insured, whose premiums had contributed to the increase of that fund, to sustain a loss. In this case the fund remaining on hand, after the last dividend, in July, 1835, was certainly not more than a prudent board of directors

ought to have retained to meet the probable losses which might occur upon the ten millions of property then insured by the company ; as it was less than three fourths of one per cent upon the amount at risk. And before the time for making the next semi-annual dividend arrived, this extraordinary calamity, which was equally destructive to the interests of the stockholders of the company and of the assured, gave to the latter a preferable claim upon all the funds and property of the company.

For these reasons I am perfectly satisfied that the decision of the vice chancellor was right. The decree appealed from must therefore be affirmed with costs.