## DAVID R. FRASER ET AL.
## v.
## ROBERT RITCHIE, EX'R.

1. CORPORATIONS — POWER TO PURCHASE THEIR CAPITAL STOCK.— The weight of authority in this country is in favor of the power of a corporation to purchase its own capital stock, except where the circumstances are such as to show that the purchase was fraudulent in fact, or that the corporation was insolvent, or in process or contemplation of dissolution at the time of such purchase.

2. EVIDENCE BEFORE MASTER.—Where, upon a reference to a master, the order of reference did not include the question of the value of certain property in dispute, proof of the value having been before heard in open court, it was error to allow evidence of such value to be given before the master, and take his report thereon.

ERROR to the Circuit Court of Cook county; the Hon. W. H. BARNUM, Judge, presiding. Opinion filed June 14, 1881.

These were bills in chancery, brought in the Circuit Court of Cook county, by appellees against appellant, resulting in decrees for the complainants. By agreement of the respective parties, the two cases were heard and considered together.

The first or Ritchie bill alleges that Agnes Ritchie loaned $12,000 to the Eagle Works Manufacturing Company, in November, 1871; that $2,000 was repaid her; that she took from them two notes, made by Gage Bros. & Rice, on October 10, 1871, for $5,000, each bearing 8 per cent. interest, and indorsed by said company, and guaranteed by P. W. Gates, and the makers being insolvent and the notes unpaid, she sued the indorser and obtained judgment against said Eagle Works Manufacturing Company for $13,580; that Mary O'Conner loaned said Eagle Works Manufacturing Company $5,000, on November 20, 1871, at 10 per cent. interest; that they repaid her all but $2,675, leaving a balance due for which she has recovered judgment against said Company for $3,180; that executions were issued on both said judgments, and returned no property found, etc., by the sheriff; charges that defend-

Fraser v. Ritchie.

ants, Fraser & Chalmers, in April, 1872, purchased of said Eagle Works Manufacturing Company $30,000 worth of personal property to it belonging, and in return sold and surrendered to said company stock of said Company for like amount, and charges same to have been fraudulent and void as against complainants, and asks that said property be subjected to payment of complainant's claims and surrendered or accounted for by said Fraser & Chalmers;   prays for a receiver, answer under oath, and also process, etc.

The answers of appellants, Fraser & Chalmers, were put in under oath, and set out that they are ignorant of nature and amount of complainant's claims against the Eagle Works Manufacturing Company, and leaves them to prove the same. Charges that same, if any, originated long after the purchase of property by defendants, hereinafter set forth.   Sets out that in January, 1872, they were stockholders of said Eagle Works Manufacturing Company, the whole stock of the company being about $270,000, and owned mostly by P. W. Gates, its President; that said Company was then flourishing and perfectly solvent, but that they were compelled to sell their stock by said Gates, and on January 12, 1872, they sold about $17,500 of stock to said company at par, and received personal property in exchange ; that said stock was worth largely over par and that the transaction was an unwilling one on their part, the property received not being worth as much as the stock sold, but in entire good faith and fair as to the company, and only unfair to the defendants ; that the balance of their stock they sold to other parties at par.

Exhibits attached to the bill showing balance sheet of the Eagle Works Manufacturing Co. Jan. 12, 1872, with net surplus of $130,653.

The bill in the Hubbard case, sets out judgment in favor of complainant for $9,865.61 and costs, against the Eagle Works Manufacturing Co., April 12, 1879 ; execution returned no property found, and claims that the indebtedness to complainant was contracted in 1871.   The remainder of the bill is the same in substance as the Ritchie and O'Connor bill.   The Eagle Works Manufacturing Company was made a party defendant, and answered admitting the allegations of this bill.

The decree, January 19, 1877, finds that indebtedness of Eagle Works Manufacturing Company to complainants arose on or before December 30, 1871, to wit: $13,580 to A. Ritchie, $3,180 to Mary O'Connor, and $9,865.66 to Mary Ann Hubbard; finds judgments against Eagle Works Manufacturing Company on same, and executions unsatisfied; finds that Fraser, on December 30, 1871, surrendered $600 stock to the said Eagle Works Manufacturing Company for cash; that on the same day Chalmers surrendered $1,520 in stock for same ; that afterwards, on or about January 12, 1872, Fraser & Chalmers jointly sold and surrendered $17,100 stock to the company in exchange for personal property; that said acts were fraudulent in law, and void as against complainants; that of the property so bought by Fraser & Chalmers, they have on hand now $15,319.15 worth in items, as reported by the master; that they have not on hand, and are both to account for in money $1,780 worth; orders Fraser & Chalmers jointly in 30 days to pay complainants $1,780 cash, to be divided among them; orders Fraser to pay $600, and Chalmers $1,520, in like manner; orders Fraser & Chalmers to turn over to a receiver all the property on hand, as reported by the master, to the amount of $15,319.15 worth, to be applied in payment of complainant's said claims.

The facts for the most part were agreed upon, being presented by stipulation of the parties; and so much thereof as are necessary to an understanding of the legal questions decided, appear sufficiently in the opinion of the court.

Mr. ARTHUR RYERSON and Mr. E. S. ISHAM, for appellants; that the purchase by a corporation of its own stock is not constructively fraudulent or void, even as to prior creditors, cited Wood v. Dummer, 3 Mason, 308; Vose v. Grant, 15 Mass. 505; Spear v. Grant, 16 Mass. 9; Curran v. Arkansas, 15 How. 304; Bartlett v. Drew, 57 N. Y. 587; Dudley v. Price, 10 B. M. 84; Bank v. St. John, 25 Ala. 568; Scott v. Eagle Ins. Co. 7 Paige, 198; Bank v. Chambers, 8 Smedes & M. 9; Bigelow v. Society, 11 Vt. 283; Taylor v. Miami Ex. Co. 6 Ohio, 218; Coleman v. Columbia Oil Co. 51 Pa. St. 77; C. P. & S. W. R.

Fraser v. Ritchie.

R. Co. v. Marseilles, 84 Ill. 643; City Bank v. Bruce, 17 N. Y. 507; Hartridge v. Rockwell, R. M. Charlt. 260; Cooper v. Frederick, 9 Ala. 738; Angell & Ames on Corp. § 280; Brice on Ultra Vires, 175; Curry v. Woodward, 44 Ala. 305; De-Peyster v. Ins. Co. 6 Paige, 486; Scott v. Ins. Co. 7 Paige, 198.

Stockholders are not trustees. Directors are trustees, but as such they bear no greater relation to stockholders than to a creditor: Angell & Ames on Corp. § 313; Verplanck v. Mercantile Ins. Co. 1 Edw. Ch. 87; Bayliss v. Orm, 1 Freem. 174; Hodges v. Screw Co. 11 R. I. 312.

Mr. GEORGE SCOVILLE and Mr. ROBERT HERVEY, for appellees; that the capital stock of a corporation is a fund set apart for the payment of its debts, and cannot be purchased by the corporation, cited Sanger v. Upton, 91 U. S. 60; Angell and Ames on Corp. § 611; Curran v. State, 15 How. 304; Sanger v. Hoag, 17 Wall. 610; New Albany v. Burke, 11 Wall. 96; Taylor v. Miami Ex. Co. 6 Ohio, 219; Peterson v. Ill. Land & Loan Co. 6 Bradwell, 257; Union Mut. Life Ins. Co. v. Frear Stone Co. 13 Chicago Legal News, 243; Hartridge v. Rockwell, R. M. Charlt. 261; C. P. & S. W. R. R. Co. v. Marseilles, 84 Ill. 643.

WILSON, J. The principal question arising in this case relates to the power of a corporation to purchase its own capital stock.

It must be admitted that no fixed nor very well defined rule is deducible from the authorities as to the right of an incorporated company to use its corporate funds or property in the purchase of its stock. The doctrine, as commonly stated in general terms is, that the capital stock of a corporation constitutes a trust fund for the payment of its debts, such stock being regarded as a substitute for the personal liability which subsists in private partnerships. It is said that when debts are incurred, a contract arises with the creditors that the capital stock or property of the company shall not be withdrawn or applied otherwise than to the satisfaction of their demands; that the creditors have a lien upon it in equity, and that if di-

verted they may follow it as far it can be traced, and subject it to the payment of their claims, except as against holders who have taken it *bona fide* for a valuable consideration without notice. 2 Story, Eq. Sec. 1252; Perry on Trusts, Sec. 217; Wood v. Dummer, 3 Mason, 308.

This principle, as a general proposition, would seem to be founded in reason and justice, and may be regarded as settled law. But it remains to be considered whether the principle, as stated, is one of universal application, admitting of no exceptions, or whether it is limited in its application, depending upon the circumstances of each particular case, the time and manner of its application, the provisions of the charter of the corporation, the nature of its business, etc.

In England the doctrine seems to be settled that corporations, whatever may be the nature of their business, cannot, without an express authority in their charters, deal in their own stock.

In Brice on Ultra Vires, 2d. Am. Ed. 94, it is said: " There is a great difference between dealing in the shares of other companies and its own. The former is ordinary business, attended with the usual risks of ordinary transactions, but the latter tends inevitably to breaches of their duty on the part of the directors, and to fraud and rigging of the market on the part of the corporation; consequently a corporation to possess such power, must have it conferred by the plainest, and most explicit language in the constating instruments."

The current of American authorities, on the other hand, seems to be to the effect that under certain circumstances and for certain purposes, moneyed corporations and corporations possessing banking powers, and in some instances other corporations, may invest their funds in the purchase of their own stock, subject to certain restrictions and limitations, one of which is that it shall not be done at such time and in such manner as to take away the security upon which the creditors, of the corporation have the right to rely for the payment of their claims, or in other words, so as not to diminish the fund created for their benefit. Each case must therefore depend upon and be determined by its own facts and circumstances,

and the difficulty sometimes met with grows out of the proper application of the rule of law to the facts of the particular case. Bartlett v. Drew, 57 N. Y. 587; Curran v. Arkansas, 15 Howard, 304; Wood v. Dummer, 3 Mason, 308; Spear v. Grant 16 Mass. 9; Taylor v. Miami Exporting Co. 6 Ohio 177; Dudley v. Price, 10 B. Mon. Bank v. St. John, 25 Ala. 568; Scott v. Eagle Fire Ins. Co. 7 Paige, 198; Bigelow v. Society, etc. 11 Vt. 283; Perry on Trusts, *supra.*

In many of the cases just cited, and in others which we have examined, the refusal of the courts to uphold the purchase by the corporation of its stock, was placed upon the ground that the corporation was at the time insolvent, or that the stock was surrendered for the purpose of winding up the company. In other cases the stock was not purchased and held by the corporation as an investment of its funds, but was immediately cancelled and never re-issued, thereby diminishing by so much the capital stock. Under such circumstances the purchase and cancellation of the stock was held to be in fraud of the rights of creditors in lessening the fund upon which they had the right to rely for their protection. We shall not stop to quote from the cases cited nor review them in detail, it being sufficient to say that in none of them is the power of a corporation to purchase its stock denied, except where the circumstances were such as to render the transaction either actually or constructively fraudulent, either as to creditors or to other stockholders of the corporation.

In Peterson v. Ill. Land and Loan Co., decided by this court and reported in 6 Bradwell, 257, it was not intended to assert the doctrine that a corporation had no power under any circumstances to purchase shares of its own stock. In that case, Clapp, a stockholder, surrendered to the company 555 shares, or more than one-half of its entire capital stock, in exchange for real estate owned by the company. The shares were not purchased by the company, and held by it as an investment, but were immediately canceled and never re-issued. The cancellation of the stock and the alienation of the real estate was simply an extinguishment of more than half the assets of the corporation, leaving it without the means to pay its creditors

in full. It was thus practically the first step in the winding up of the company. We then said: "It was not the taking of stock pledged for the payment of a debt due to the company, nor yet a purchase of the stock to be held as an investment for the benefit of the company and the stockholders generally. The stock was never re-issued, but was canceled and extinguished, thus diminishing by more than one-half the entire capital of the company. The company conveyed to Clapp valuable real estate in exchange for his stock, and thereby reduced its available assets to the extent of the value of the property conveyed. If it could do this with one shareholder, it could do it with another, until there should be neither capital stock nor corporate property remaining out of which to satisfy creditors."

As will be perceived, our decision was based, not upon the ground of an entire want of power of a corporation to purchase its stock, but that under the circumstances of the case for it to do so was in fraud of the rights of the creditor. And upon principle, we think it would be pushing the doctrine of trusts as applied to the capital stock of an incorporated company too far to hold that it takes away the power of the corporation to purchase its stock under any and all circumstances, for this would be to deprive it of the right to make an investment which, in a given case, might be highly advantageous both to the creditor and the corporation, and would moreover ignore all distinctions between a corporation which is insolvent or in process of dissolution, and one which is engaged in a prosperous and active business, with abundant means to meet all its obligations. If, in contemplation of winding up, or when insolvent, a corporation should attempt to divide its effects among its stockholders, either directly or indirectly, by accepting a surrender of their stock in exchange for the corporate property, the transaction would not be upheld as against the equitable rights of creditors: and this, it is apprehended, is the limited application of the doctrine which the American courts and text-writers have intended when speaking of the trust character of capital stock, rather than that general and universal application which would deprive a corporation of all

power and discretion in respect to the disposition of its capital stock.

Without going more at large into this branch of the case, our conclusion is that the weight of authority in this country is in favor of the power of a corporation to purchase its own capital stock, except where the circumstances are such as to show that the purchase was fraudulent in fact, or that the corporation was insolvent or in process or contemplation of dissolution at the time of the purchase.

Most of the cases which we have examined were, it is true, cases relating to financial or commercial corporations, but we are unable to see any valid grounds for holding that a corporation for manufacturing purposes may not, as between itself and its creditors, invest its surplus earnings in the purchase of shares of its stock, which would not apply with equal force to the former class.

By the stipulation of the parties, it is admitted that the purchase of the stock by the company from Fraser and Chalmers was entirely fair, and made by both parties in good faith. It is admitted that at the time of the purchase the company was solvent, and had assets sufficient to pay all its liabilities, including the capital stock, leaving a large surplus; that the stock was worth more than par, and known to be so by all the parties; and that the property received by Fraser and Chalmers in exchange for the stock was fairly valued. It is admitted that the stock bought of Fraser and Chalmers was not surrendered by them for cancellation, and if canceled, was not canceled until after they had ceased to be members of the company, except as to $600 surrendered by Fraser, and $1,520 by Chalmers, December 30, 1871. It is also admitted that the stock was not surrendered for the purpose of winding up the company, and that no winding up was contemplated for at least a year after Fraser and Chalmers sold their stock and retired from the company, and that meantime the company continued doing a prosperous business.

These admitted facts exclude all actual fraud, and if the view which we have adopted as to the law be correct, they also

exclude all constructive fraud, and place the transaction beyond the attack of creditors.

In the view we have taken of the case, it becomes unnecessary to determine whether the claims of appellees upon which the present proceedings are based originated prior or subsequent to the purchase and surrender of the Fraser and Chalmers stock, or to pass upon the third point made by appellants, namely: that if appellees are entitled to any relief against Fraser and Chalmers, it was only to the extent of recovering from them such a *pro rata* share of appellees' claim as the amount of stock surrendered bears to the whole amount of the capital stock of the company. Whether if a proper case for relief were made against Fraser and Chalmers, they would be chargeable primarily to the entire amount of the stock surrendered, leaving them to such redress by way of contribution from their co-stockholders as the law would entitle them to, we do not determine.

Appellees assigned various cross-errors, none of which, however, do we think can be sustained, except the last, viz: that the court erred in not finding appellants liable to pay appellees the sum of $350, or some other specific sum of money for the value of one Rochester Boring Machine had by them from said company.

It appears that Fraser and Chalmers received, amongst other property of the company, the boring machine, which was inventoried at $350, and was claimed to be of that value, without paying for it. Appellees, as creditors of the company, claimed that amount from them, but the claim was disallowed by the court. The two Gates testified as to the value of the articles inventoried, swearing that all the articles inventoried were fully worth the prices stated in the inventory.

Wm. J. Chalmers testified before the master that the boring machine was worthless except for scraps, and did not exceed in value $15. As that question was not included in the order of reference, the testimony was objected to on that ground, and exception was taken to its introduction and the finding of the master on that subject. The exception was well taken, and should have been sustained. The proof of value had been taken

some time before, on the hearing before the court, and the court apparently not desiring any further light on that point, did not direct the master to take any proof in relation thereto.

For the reasons hereinabove indicated, the decree of the court below must be reversed and the cause remanded, for further proceedings not inconsistent with the views herein expressed.

Reversed and remanded.